**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**CASE NO. _____**

TREVOR GOSE AND BRITTNEY GOSE,
EACH INDIVIDUALLY AND AS NEXT
FRIENDS TO A.M. AND A.G.,

    Plaintiffs,

  v.

THE MICHAELS ORGANIZATION, LLC,
AMC East Communities, LLC, and MMS Air
Force, LLC,

    Defendants.

_____/

## **COMPLAINT**

Plaintiffs, Trevor Gose, a Staff Sergeant in the United States Marine Corps stationed at MacDill Air Force Base in Tampa, Florida ("MacDill"), and his family, lived in unsafe and unhealthy conditions while in privatized on-base military housing provided and managed by Defendants. Defendants' acts and omissions with respect to their operation, management, and maintenance of Plaintiffs' housing, as detailed in this Complaint, led directly to the unsafe and unhealthy conditions of their residence. Moreover, Defendants concealed these conditions from Plaintiffs through false and misleading statements and the failure to disclose known hazards. When these

conditions were discovered, Defendants failed to properly repair and remediate them. Plaintiffs bring this action to hold Defendants accountable for their acts and omissions.

## THE PARTIES

1. Plaintiffs TREVOR GOSE and BRITTNEY GOSE resided at MacDill Air Force Base in Tampa, Florida at all times relevant to this Complaint. TREVOR GOSE and BRITTNEY GOSE are the parents of Plaintiffs A.M. and A.G., who also resided at MacDill at all relevant times.

2. Defendant THE MICHAELS ORGANIZATION, LLC ("Michaels" or "The Michaels Organization") is a New Jersey limited liability company with its principal place of business at 2 Cooper Street, Camden, New Jersey 08102. Michaels is registered to do business in Florida.

3. Defendant AMC EAST COMMUNITIES, LLC ("AMC") is a Delaware limited liability company with its principal place of business at 2 Cooper Street, Camden, New Jersey 08102. AMC is listed as the "Owner" on the lease signed by the Plaintiffs.

4. Defendant MMS AIR FORCE, LLC ("MMS") is a New Jersey limited liability company with its principal place of business at 2 Cooper Street, Camden, New Jersey 08102. MMS is registered to do business in Florida. MMS has acted as property manager with respect to MacDill housing at all times relevant to this complaint.

5. Non-defendant HARBOR BAY AT MACDILL ("Harbor Bay") is the entity through which Defendants conducted many of the leasing, management, and maintenance activities relating to military housing at MacDill. It presents itself as the

2

landlord, upon information and belief, appearing as the "Landlord/Lessor" on Mold Addenda, even though Defendant AMC is the owner or the lessor on the leases. Harbor Bay is listed as the Community Manager and Property Manager on Plaintiffs' lease—identified as the successor in interest to Michaels Management Services, Inc.—and, upon information and belief, on the lease addenda. Despite conducting extensive business operations in Florida, Harbor Bay is not a registered entity with the Florida Department of Corporations.

6.      In related litigation, *Mullins et al. v. The Michaels Organization, LLC, et al.*, Case No. 8:25-cv-02637-SDM-AAS (M.D. Fla.), Defendant AMC represented that Harbor Bay is a "common or trade name" of Michaels and not a distinct legal entity. Plaintiffs allege the same upon information and belief. On information and belief, Defendants jointly manage, operate, and maintain MacDill military housing and are jointly responsible for the acts and omissions of Harbor Bay. Allegations concerning Harbor Bay therefore constitute allegations concerning Defendants.

## JURISDICTION AND VENUE

7.      This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331. The acts and omissions underlying Plaintiffs' claims occurred on a federal enclave, MacDill Air Force Base, over which the United States was ceded exclusive federal legislative jurisdiction in 1950. Plaintiffs are aware of no developments since 1950 that have had the effect of changing MacDill's status as an exclusive federal enclave. Because the acts and omissions giving rise to Plaintiffs' claims occurred on an exclusive federal enclave, Plaintiffs' claims are governed by federal law under the Federal

3

Enclave Doctrine for purposes of subject-matter jurisdiction. *See Mater v. Holley*, 200 F.2d 123, 124 (5th Cir. 1952).

8.    Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because the events and omissions giving rise to Plaintiffs' claims occurred within this District on the federal enclave at MacDill where Plaintiffs were exposed to the conditions at issue.

9.    This Court has personal jurisdiction over Defendants because their acts and omissions—carried out directly and/or through their agents and alter-egos—caused the harms complained of herein, which occurred at MacDill. FLA. STAT. §§ 48.193(1)(a)(2), 48.193(1)(a). Defendants also derived substantial revenue, directly or indirectly, from services provided to persons in Florida.

## FACTUAL ALLEGATIONS

### The Military Housing Privatization Initiative

10.    In 1996, Congress enacted the Military Housing Privatization Initiative ("MHPI"). 141 Cong. Rec. S18853. The MHPI was intended to improve housing for service members and their families by allowing private housing companies to use their resources and expertise in improving existing military housing and new military housing.

11.    Under the MHPI, a private contractor is granted a long-term lease of military base grounds. The private contractor is responsible for constructing new homes and renovating existing homes and then leasing, operating, managing, and maintaining the housing. The government also typically pays the contractor the full Basic Allowance for Housing ("BAH") to which the service member who rents the home is

entitled. In addition, MHPI contractors typically receive performance incentive fees, payable by the military department based on performance objectives, which include maintenance practices and resident satisfaction.

12.    In response to concerns about dangerous, unsafe, and unhealthy conditions at MHPI housing, the 2020 National Defense Authorization Act created an MHPI Tenant Bill of Rights. The Tenant Bill of Rights specifies that military families have the right to reside in a housing unit that meets applicable health and environmental standards. They have the right to receive property management services that meet or exceed industry standards and that are performed by professional customer service and maintenance staff. 10 U.S.C. § 2890. Defendants purport to embrace the Tenant Bill of Rights and to incorporate its protections into their MHPI programs and activities.

13.    Landlords are required to provide a housing unit that meets "minimum health, safety, and welfare standards set forth in Federal, State, and local law" and, if a walkthrough prior to move in indicates that those standards are not met, "remediate any issues and make any appropriate repairs[.]" 10 U.S.C. § 2891a(4).

### MHPI Housing at MacDill

14.    In November 2007, AMC East, LLC and the United States Air Force entered into a 50-year lease to privatize military housing at MacDill AFB. In 2021, Michaels acquired the assets of AMC East, LLC and AMC. Michaels, either directly or through its subsidiaries or affiliates, assumed all obligations, as the MHPI

contractor, including but not limited to obligations under the ground leases, operating agreements, property management agreements, and residential leases.

15. Plaintiffs paid their BAH to AMC. In addition, the Air Force pays Defendants for management and maintenance of the property. These payments consist of (1) a monthly base fee and (2) an incentive fee payment upon achieving certain performance criteria. To obtain the incentive fee, Defendants submit documentation and a statement that they satisfied performance criteria, including objectives related to maintenance work orders and customer satisfaction.

16. Language in the Operating Agreement indicated that the Agreement was intended to further the MHPI's goal of benefiting residents of MacDill military housing.

### Defendants' Joint and Integrated Approach to MacDill Housing

17. Defendants are members of the Michaels conglomerate, at the top of which sits Michaels. Defendants function as an integrated enterprise in their operation of MacDill housing.

18. With respect to its activities at MacDill, on information and belief, Michaels operates independently and through entities, including Defendants AMC and MMS and non-defendant Harbor Bay.

19. The Michaels webpage showcases its involvement in military housing and points to MacDill as one location of its "[q]uality housing from Coast to Coast." Moreover, employees whose e-mail addresses and signature blocks suggest that they

6

are employed by Michaels regularly work with residents at MacDill, including on leasing and maintenance issues.

20. Defendants were bound in agency and alter-ego relationships in leasing, operating, managing, maintaining, and repairing the homes at MacDill.

**The Unsafe and Unhealthy Housing Conditions at MacDill**

21. Defendants have long known about mold problems at MacDill. Military families have for years submitted complaints about mold and health issues caused by exposure to mold. The standard lease contains warnings about moisture and mold. The Resident Guidelines and Community Handbook stress the need to immediately report signs of leaks, moisture, or mold.

22. For example, upon information and belief, Defendants were aware that numerous homes lacked vapor barriers between the first floor and outdoors or contained defective vapor barriers. This allowed unsafe amounts of moisture to enter the homes. Additionally, the air conditioning units in numerous homes lacked secondary drain lines, causing water to leak into homes.

23. Harbor Bay refused to follow its mold policies, despite knowing that failure to do so would lead to the growth of toxic mold.

**The Gose Family**

24. Staff Sergeant ("SSgt") Trevor Gose, United States Marine Corps, his spouse, Brittney Gose, and their minor children, A.M. and A.G., resided at 8518 Levitow Street, MacDill, from approximately August 9, 2024, through December 2025, when they relocated to another on-base residence at 2024 McClelland Avenue because

7

of the ongoing environmental conditions within their first home.

25.     SSgt Gose entered into a lease with Defendants prior to moving into the residence and before conducting a walkthrough of the home. The lease listed AMC as the Owner, Harbor Bay at MacDill—the successor in interest to Michaels Management Services, Inc.—as the Community Manager and Property Manager, and provided that Florida law governed the lease.

26.     Plaintiffs' lease represented that, prior to moving in, the home was in safe, clean, and habitable condition. That representation was false. Had Defendants disclosed the true condition of the home, Plaintiffs would not have signed the lease or agreed to occupy the residence. The specific contents of any pre-lease disclosures and all representations made by Defendants' representatives prior to lease execution, including the identity of each such representative, are known to, and within the possession, custody, and control of, Defendants.

27.     The Gose family was provided with a copy of the home's seven-year maintenance history, but upon information and belief, it was incomplete and only contained three to five years of maintenance history. The Gose family read the history carefully, and there was no mention of any prior repairs regarding mold, mildew, or leaks; it only disclosed prior repairs to the home's AC, which were marked complete.

28.     During their tenancy, Plaintiffs observed, came into contact with, ingested, and inhaled mold, experienced elevated interior moisture and water intrusion, and suffered personal injuries due to the unsafe and unhealthy conditions described in this Complaint.

29.    Within days of moving into the residence, the Gose family began experiencing moisture-related problems. On or about August 11, 2024, the family submitted a maintenance request after noticing a persistent musty odor in the kitchen. Harbor Bay maintenance personnel discovered standing water pooled beneath the dishwasher. Although Harbor Bay dried the standing water, it did nothing to identify or repair the source of the water intrusion beneath the dishwasher, and no remediation was performed. The identities of these maintenance personnel are known to, and within the possession, custody, and control of, Defendants.

30.    The family also placed a work order for a leak from the stove vent in their kitchen, as water would come through the vent every time it rained. Despite these reports, no Harbor Bay maintenance personnel came to inspect or repair this leak.

31.    Following Hurricane Milton, on or about October 12, 2024, the family returned to find a pan full of water on their kitchen stove. The family received notice that their home had hurricane damage and a leak in the kitchen. This leak was the same one the Goses reported to Harbor Bay before Hurricane Milton. The family was told that any repairs would be delayed for several weeks.

32.    Beginning on or about November 18, 2024, and continuing nearly every month through August 2025, the Gose family repeatedly submitted maintenance requests because the home's HVAC system failed to adequately cool the upstairs of their residence, requiring their children to sleep downstairs on the couch for the remainder of their tenancy. Despite the frequency of these complaints, Defendants failed to permanently correct the underlying problems.

33. On or about May 3, 2025, the family reported blue and black mold forming within the pantry. Harbor Bay's then-Environmental Supervisor, Mike Whitman, dismissed the visible growth as "wood discoloration" rather than mold, and no mold testing or further investigation was performed. Independent testing in November 2025 confirmed significant amounts of toxic mold in the Gose family's kitchen.

34. On June 20, 2025, the family reported a ceiling leak in the dining room. An unknown maintenance technician stopped at the house, looked at the ceiling, and said he would return on Monday. The identity of this maintenance technician is known to, and within the possession, custody, and control of, Defendants. The Gose family then emailed the Assistant Community Director, Geri Leto, asking for help because of pending storms and a musty smell. Ms. Leto responded that a vendor would need to investigate the leak and offered no other assistance.

35. Heavy rain fell throughout the weekend, and the leak formed large bubbles in the dining-room ceiling. On Monday, June 23, 2025, Harbor Bay maintenance cut a large hole in the ceiling and placed a fan beneath the leak, but it failed to repair the roof or eliminate the source of the water intrusion. For weeks, the family was forced to place towels and buckets beneath the leaking ceiling to collect water, all while emailing Ms. Leto every few days for assistance. The identities of the maintenance personnel who performed these cosmetic repairs are known to, and within the possession, custody, and control of, Defendants.

36. In late July 2025, rather than completing permanent repairs, Harbor Bay covered the damaged dining-room ceiling with plastic sheeting. That plastic remained

in place until the family vacated the residence approximately five months later.

37.    When SSgt Gose complained about the lack of repairs in an Air Force Housing survey, on or about July 14, 2025, Air Force Captain Toyre Hudson from the MacDill Housing Office contacted Harbor Bay and demanded a life, health, and safety inspection for the Gose family. After that inspection, Mike Whitman emailed the MacDill Housing Office on July 16, 2025, and outlined a three-phase remediation plan scheduled to begin on July 21, 2025. The three-phase plan stated that its timeline was an estimate and might change based on contractor availability. The first step of this plan was to repair the upstairs bathroom, which had mold and excess moisture in the floor and around the tub. The plan was to remove the toilet and all the laminate flooring, inspect the subfloor and framing for moisture and replace any moldy sections, and then run dehumidifiers if there was excessive moisture. None of this occurred.

38.    Instead, Harbor Bay workers came to the home, removed the toilet, which they left in the bathtub, removed the flooring, and placed fans in the bathroom. The fans remained there for two weeks. No moisture testing or dehumidification occurred. SSgt Gose complained to Mike Whitman about the lack of progress in the bathroom, which resulted in Harbor Bay eventually returning to the home, replacing the flooring in the upstairs bathroom, and reinstalling the toilet. This was a significant departure from the plan promised by Mike Whitman in mid-July.

39.    On August 4, 2025, Pennoni Associates, contractors hired by Harbor Bay, performed a licensed Moisture and Fungal Assessment of the residence. Although no mold sampling was conducted, the inspection documented suspected fungal

growth within the exterior HVAC closet, on portions of the HVAC evaporator coils, and on drywall adjacent to the HVAC system, as well as on multiple HVAC supply vents throughout the residence, including in the laundry room, half bathroom, primary bedroom, and primary bathroom. Water staining was also identified on the ceiling of a second-floor bedroom. The report acknowledged that the inspection represented only a "snapshot in time" and that concealed fungal growth behind walls or ceilings could not be identified without destructive testing, which was not performed.

40.    After this assessment, Harbor Bay told the Gose family they would be displaced for a month while the repairs and remediation occurred at their home. However, based on Mike Whitman's email stating that the repair and displacement timeline was only an estimate, as well as conversations with neighbors and other residents whose displacements often lasted far longer than initially represented, the Gose family believed the process would be prolonged. Rather than face an extended displacement without access to their personal belongings for months, as Harbor Bay would change the locks during remediation, the Goses demanded a new home. It took months, but with SSgt Gose's commander's involvement, Harbor Bay eventually agreed to provide a new home.

41.    While waiting for a new home, an independent mold inspector evaluated the residence on November 8, 2025, and determined the home was unfit for human occupancy due to pervasive toxic mold throughout the home.

42.    Harbor Bay initially offered the Gose family another home with documented AC issues and mold throughout the home. The family rejected that offer.

Harbor Bay then offered the family a second home and told the Goses that if they did not accept this residence, they would not be provided an on-base home and would have to move off-base. Given those choices, and that the seven-year history on the second home did not indicate recurring mold or AC issues, the Gose family accepted and relocated to their current residence at 2024 McClelland Avenue in December 2025. Since moving in, the AC dehumidifier in their new home has failed, and the AC drain line has also clogged several times.

43. Throughout their tenancy, members of the Gose family experienced worsening respiratory symptoms, chronic sinus problems, headaches, sleep disruption, and anxiety. SSgt Gose suffered from brain fog, increased joint pain, teeth pain, and ultimately required sinus surgery. Ms. Gose experienced headaches, depression, menstrual irregularities, stomach pain, joint pain, and brain fog. Both minor children developed allergy-type symptoms and breathing irritation while living in the residence. A.M. suffered from bouts of diarrhea and stomach pain. A.G. suffered from severe eczema flare-ups, nosebleeds, diarrhea, sudden and unexplained bouts of anger, and cognitive difficulties. The family pug suffered from alopecia-like hair loss and sudden seizures. These conditions are consistent with, and the family attributes them to, prolonged exposure to unresolved moisture intrusion, persistent HVAC failures, and mold contamination throughout the home's HVAC system and structural components.

44. The Gose family was not informed of the existence, nature, or extent of the mold contamination prior to moving into their first home or for most of their tenancy. As a result of Defendants' repeated representations that conditions had been

addressed and their marking work orders as "Complete," the family continued to occupy the residence without knowledge of the true hazards to which they were being exposed.

45.    Prior to their relocation in December 2025, and as a direct result of Defendants' repeated misrepresentations and concealment of the true nature and extent of the conditions in the home, the Gose family did not know that mold exposure was causing or contributing to their health symptoms.

46.    The Gose family came into contact with and inhaled or ingested mold and other hazardous substances and suffered physical injuries, emotional distress, financial losses, and other damages as a direct and proximate result of Defendants' acts and omissions. Had the Gose family known the true nature and extent of the dangerous conditions within the home, they would not have moved into or remained in the residence. They continue to worry about the long-term effects of their exposure.

47.    Notwithstanding MacDill's status as a federal enclave, those of Plaintiffs' claims that seek recovery for personal injuries (including physical and emotional injuries) are governed, under 28 U.S.C. § 5001(b), by contemporary Florida law. Contemporary Florida law also governs Plaintiffs' claims because all of those claims arise out of Plaintiffs' injuries suffered as a result of Defendants' acts and omissions in leasing, managing, and maintaining the home Plaintiffs leased from Defendants, and Plaintiffs' lease contains a choice of law provision selecting contemporary Florida law.

14

## COUNT I: Breach of Contract
### (against Defendant AMC)

48. Plaintiffs incorporate the allegations set forth in paragraphs 1–47.

49. Plaintiffs had a valid lease with AMC. AMC owed contractual obligations to Plaintiffs to provide and maintain habitable housing and remedy leaks, moisture, mold, and other issues. Plaintiffs have complied with all obligations under the lease.

50. AMC failed to comply with the material terms of the lease by failing to ensure Plaintiffs' house was fit for human habitation and by failing to timely and adequately repair and remedy the conditions of the premises.

51. As direct and foreseeable results of AMC's breaches, Plaintiffs suffered physical, psychological, emotional, and financial harm. As direct and foreseeable results of AMC's breaches, Plaintiffs suffered substantial actual damages, including personal and property damages, financial damages, damages that require medical monitoring, and attorneys' fees and costs.

## COUNT II: Negligence
### (against all Defendants)

52. Plaintiffs incorporate the allegations set forth in paragraphs 1–47.

53. Defendants owed a duty to Plaintiffs to exercise reasonable care in the operation, management, maintenance, and repair of their home. Defendants negligently failed to meet the standard of care in performing those duties.

54. As the property owner and lessor of Plaintiffs' home, AMC owed Plaintiffs a duty to maintain their home in a reasonably safe condition and to remediate

moisture, mold, and other dangerous conditions pursuant to a reasonable standard of care.

55.    As property manager for Plaintiffs' MacDill home, Defendants owed a duty to Plaintiffs to maintain the premises in a reasonably safe condition and to remediate moisture, mold, and other dangerous conditions pursuant to a reasonable standard of care. In addition, on information and belief, as the operators of Harbor Bay, which managed and performed maintenance on the home, Defendants owed a duty to Plaintiffs to maintain the premises in a reasonably safe condition and to remediate moisture, mold, and other dangerous conditions pursuant to a reasonable standard of care.

56.    Defendants' acts and omissions in performance of their duties as Plaintiffs' lessors, landlords, and property managers fell far below the standard of care owed to Plaintiffs under Florida law.

57.    Defendants' acts and omissions breached the duty of reasonable care owed to Plaintiffs by failing to ensure that Plaintiffs' home was safe and fit for habitation.

58.    Defendants breached the duty to exercise ordinary care in multiple respects, including: (a) failure to remediate defects they knew, or reasonably should have known, would cause moisture intrusion, elevated indoor humidity, and microbial growth; (b) failure to reasonably repair and remediate issues related to mold, moisture, water leaks, and the home's HVAC system; (c) failure to adequately respond to Plaintiffs' complaints regarding unsafe conditions in their home; (d) failure to implement

16

appropriate safety protocols to protect residents from toxic mold; (e) failure to identify or repair the source of the water intrusion beneath the dishwasher after merely drying the standing water; (f) failure to repair the roof and the dining-room ceiling leak, instead cutting a hole, placing a fan, and covering the damage with plastic sheeting for months; (g) failure to permanently correct the recurring HVAC cooling failures reported nearly every month; (h) dismissing visible pantry mold as "wood discoloration" and conducting no testing or investigation; and (i) marking maintenance work orders "Complete" when the reported conditions had not been permanently resolved.

59.   Defendants engaged in additional safety violations and breaches of the duty of care to be determined upon discovery.

60.   Defendants knew or should have known that maintenance failures had compromised the safety of Plaintiffs' home.

61.   As a direct and proximate result of Defendants' negligence, Plaintiffs suffered substantial damage to their personal property, physical injuries, financial harm, and damages that will require medical testing/monitoring, as well as severe mental and emotional distress related to those physical injuries.

## COUNT III: Gross Negligence
### (against all Defendants)

62.   Plaintiffs incorporate the allegations set forth in paragraphs 1–47.

63.   Defendants owed a duty to Plaintiffs to exercise reasonable care in the operation, management, maintenance, and repair of their home at MacDill. Defendants' conduct fell grossly below the applicable standard of care. Moreover, Defendants

were recklessly indifferent to the consequences of their acts and omissions and failed to demonstrate even the slight diligence that a reasonable landlord or property manager would have exercised under the same or similar circumstances.

64.   As the owner and lessor of Plaintiffs' home, AMC owed Plaintiffs a duty to maintain Plaintiffs' home in a reasonably safe condition and to remediate moisture, mold, and other dangerous conditions pursuant to a reasonable standard of care.

65.   As property manager for Plaintiffs' home, Defendants owed a duty to Plaintiffs to maintain the premises in a reasonably safe condition and to remediate moisture, mold, and other dangerous conditions pursuant to a reasonable standard of care. In addition, on information and belief, as the operators of Harbor Bay, which managed and performed maintenance on the home, Defendants owed a duty to Plaintiffs to maintain the premises in a reasonably safe condition and to remediate moisture, mold, and other dangerous conditions pursuant to a reasonable standard of care.

66.   Defendants were aware that circumstances in Plaintiffs' home constituted an imminent or clear and present danger amounting to more than normal or usual peril with tenants often complaining to Defendants of mold and illnesses.

67.   Defendants' acts and omissions fell grossly below the standard of care owed to Plaintiffs, and exhibited a conscious disregard for the consequences of their behavior, in multiple respects, including: (a) failure to remediate defects that would cause moisture intrusion and microbial growth; (b) failure to reasonably repair and remediate complaints of water leaks, HVAC failures, and mold; (c) failure to implement appropriate safety protocols to protect residents from toxic mold; (d) failure to

adequately respond to Plaintiffs' complaints regarding unsafe conditions in their home; (e) failure to warn Plaintiffs that they were being exposed to toxic mold; (f) failing to identify or repair the source of the water intrusion beneath the dishwasher; (g) failing to repair the roof and dining-room ceiling leak, instead covering the damage with plastic sheeting for months; (h) dismissing visible pantry mold as "wood discoloration" and conducting no testing; (i) marking maintenance work orders "Complete" when the conditions remained unresolved; and (j) engaging in additional safety violations and breaches of the duty of care to be determined upon discovery.

68.    Each of the Defendants' reckless indifference to the rights of Plaintiffs is equivalent to an intentional violation of them.

69.    As a direct and proximate result of Defendants' gross negligence, the Plaintiffs suffered substantial damage to their personal property, physical injuries, financial harm, and damages that will require medical testing/monitoring, as well as severe mental and emotional distress related to those physical injuries.

## COUNT IV: Omitted

## COUNT V: Negligent Infliction of Emotional Distress
### (against all Defendants)

70.    Plaintiffs incorporate the allegations set forth in paragraphs 1–47.

71.    By their acts and omissions, Defendants caused Plaintiffs to be exposed to and come into direct physical contact with mold-contaminated conditions within their home, and to come into contact with and ingest and/or inhale mold.

72.    As a result of that physical contact and exposure, Plaintiffs suffered

physical injury, including, but not limited to, respiratory illness, allergic reactions, skin conditions, and other bodily harm.

73. As a direct consequence of these physical injuries, Defendants caused the Plaintiffs to suffer severe emotional distress, including worry, anxiety, anguish, suffering, and grief. Plaintiffs suffered additional physical injuries as a result of the emotional distress.

74. Plaintiffs' claims for emotional distress arise directly from physical impacts and resulting physical injuries caused by Defendants' conduct. Each Plaintiff sustained direct physical contact with toxic mold within the home, and the members of the family suffered resulting physical injuries, including such conditions as respiratory illness, allergic reactions, skin conditions, and other bodily harm documented in this Complaint. Plaintiffs' emotional distress arises from, and is accompanied by, physical manifestations and injuries.

75. Defendants knew or should have known that Plaintiffs' home was unsafe to reside in, and that exposure to and contact with mold would inevitably occur and would result in physical harm to Plaintiffs.

76. As a direct result of Defendants' negligence and gross negligence, Plaintiffs came into physical contact with mold.

77. Plaintiffs suffered severe emotional distress as a result of that unhealthy and dangerous contact. Plaintiffs suffered physical injury as a result of the emotional distress.

78. Defendants are liable for the consequences that they knew or should have

20

known would occur because of their negligent conduct.

79.    Plaintiffs have suffered, are suffering, and will continue to suffer severe emotional distress and associated harms because of Defendants' acts and omissions.

## COUNT VI: Intentional Infliction of Emotional Distress
### (against all Defendants)

80.    Plaintiffs incorporate the allegations set forth in paragraphs 1–47.

81.    Defendants intentionally and knowingly subjected Plaintiffs to housing conditions that were unsafe and unhealthy.

82.    Defendants also recklessly misled Plaintiffs into moving into a home that they knew was dangerous and unfit for human habitation. Defendants then deceived the Plaintiffs into remaining in their home by falsely claiming that they would eliminate those dangers.

83.    This intentional conduct, which subjected Plaintiffs to risk of serious injury or illness over a prolonged period, was extreme and outrageous.

84.    Intentionally subjecting the Plaintiffs to such dangerous conditions and taking actions to ensure their continued exposure, is beyond all possible bounds of decency and intolerable in a civilized community.

85.    This conduct caused severe emotional distress, as Plaintiffs suffered serious injuries and watched their loved ones get sick, and eventually understood that they were constantly in grave danger in their own home.

86.    Plaintiffs suffered emotional and physical injury due to their severe emotional distress.

21

## COUNT VII: Breach of the Warranty of Habitability
### (against Defendant AMC)

87.     Plaintiffs incorporate the allegations set forth in paragraphs 1–47.

88.     AMC breached express and implied warranties of habitability.

89.     AMC owed Plaintiffs a duty to provide them with habitable living conditions, under FLA. STAT. § 83.51, including but not limited to a duty to exercise reasonable care in the operation, inspection, management, and maintenance of Plaintiffs' home. AMC failed to meet the standard of care in performing those duties. In their lease, AMC warranted that the housing it provided was safe, habitable, and free from defects.

90.     AMC failed to live up to its duty to inspect the Plaintiffs' home prior to their moving in, make necessary repairs, and transfer them to a reasonably safe home.

91.     After Plaintiffs moved in, AMC did not reasonably maintain the home to meet the ordinary and normal standards of fitness. The moisture, leaks, and mold in Plaintiffs' home were dangerous conditions that AMC should have remediated.

92.     As a result of AMC's breach of the express and implied warranties of habitability, Plaintiffs suffered substantial physical injuries and damage as well as harm to their personal property and other financial harm. Plaintiffs also suffered severe mental and emotional distress related to contact with toxic mold. Plaintiffs suffered special damages and will require ongoing testing/medical monitoring.

## COUNT VIII: Third-Party Beneficiary Contract
### (against all Defendants)

93.     Plaintiffs incorporate the allegations set forth in paragraphs 1–47.

94.    Defendants are bound by their contracts with the Air Force respecting MHPI housing at MacDill. Each of those contracts was entered into to further the goal of the MHPI to improve housing for service members.

95.    The Operating Agreement originally entered into by AMC East, LLC and the Air Force creating AMC contains language establishing that Plaintiffs were intended beneficiaries of Defendants' contractual obligations with respect to the provision of housing at MacDill. On information and belief, the current version of any Operating Agreement under which AMC presently operates continues to contain such or similar language.

96.    On information and belief, the Ground Lease, entered into by the Air Force and AMC, also contains language indicating that Plaintiffs were intended beneficiaries.

97.    On information and belief, property management agreements governing Defendants' property management practices at MacDill also contain provisions indicating that Plaintiffs were intended beneficiaries of those agreements.

98.    Defendants and the Air Force intended to benefit the service members living at MacDill. SSgt Gose is a service member living at MacDill with his family. The obligations to provide these intended benefits were included in the underlying contracts to ensure military service members, including Plaintiffs, would be provided with safe and habitable housing.

99.    Defendants breached the requirements of the underlying contracts by failing to provide suitable management, maintenance, operations, and renovations of

Plaintiffs' home.

100.    Defendants also breached the duty of good faith and fair dealing implied in the contracts.

101.    As a foreseeable result of the Defendants' breaches of the contracts, Plaintiffs, who are intended, direct, third-party beneficiaries of such contracts, sustained damages.

### COUNT IX: Negligence Per Se
### (against all Defendants)

102.    Plaintiffs incorporate the allegations set forth in paragraphs 1–47.

103.    Defendants owed Plaintiffs a duty to take steps to protect them from the specific injuries outlined in this Complaint.

104.    This duty was created by statutes specifically intended to protect Plaintiffs from those harms.

105.    For example, section 19-231 of Tampa's Code of Ordinances states that, "No person shall occupy or let to another for occupancy or offer to let to another for occupancy any dwelling or dwelling unit which does not comply with the following standard." It then outlines a list of specific requirements intended to protect residents' health and safety. Defendants failed to comply with these requirements, including:

a) "*General condition of rental unit.* Each dwelling unit let or offered to let shall be clean, sanitary, fit for human habitation and in a good state of repair." Tampa Code of Ordinances § 19-231(17);

b) "Every floor, wall and ceiling shall be capable of affording privacy and shall be maintained in a good state of repair." *Id.* §19-231(10);

c) "*Plumbing fixtures and pipes.* Every plumbing fixture and water and waste pipe shall be maintained in good working condition, free from defects, leaks and obstructions." *Id.* § 19-231(13);

d) "*Kitchen and bathroom floors.* Floors in kitchens and bathrooms, except where constructed of materials impervious to moisture, shall be covered with asphalt, vinyl-plastic, rubber tile, ceramic tile, terrazzo or linoleum or other durable, waterproof, nonabsorptive material." *Id.* § 19-231(14)(a);

e) "*Flooring generally.* All other flooring throughout the dwelling shall be of approved grade and type of material properly installed." *Id.* § 19-231(14)(b).

106. Defendants also failed to comply with § 19-232, which provides that, "The owner shall be responsible for the repair and replacement of all plumbing facilities and equipment." *Id.* § 19-232(7).

107. Defendants also failed to comply with § 19-47, which provides that, "[n]othing shall be allowable on the premises within the corporate limits of the city provided for in this chapter that shall in any way be offensive or noxious by reason of the emission of odors, gases, dust, smoke, light, vibration or noise . . . nor shall anything be constructed or maintained that would in any way constitute an eyesore or nuisance to adjacent property owners or residents or to the community." *Id.* § 19-47.

108. Additionally, Florida has a statutory framework regulating mold-related services in order to protect Plaintiffs from the injuries described above. FLA. STAT. § 468.84 *et seq.*

109. The Florida legislature determined that this statutory framework is "necessary in the interest of the public safety and welfare, to prevent damage to real and personal property, to avert economic injury to the residents of this state, and to regulate persons and companies that hold themselves out to the public as qualified to perform mold-related services." *Id.* § 468.84.

110. Defendants failed to comply with the following statutory requirements:

a) "A person may not … perform or offer to perform any mold assessment unless the mold assessor has documented training in water, mold, and respiratory protection under § 468.8414(2)." *Id.* § 468.8419(1)(a);

b) "A person may not … perform or offer to perform any mold remediation to a structure on which the mold assessor or the mold assessor's company provided a mold assessment within the last 12 months." *Id.* § 468.8419(1)(d);

c) "A person may not … accept an engagement to make an omission of the assessment or conduct an assessment in which the assessment itself, or the fee payable for the assessment, is contingent upon the conclusions of the assessment." *Id.* § 468.8419(1)(h);

d) "A mold remediator, a company that employs a mold remediator, or a company that is controlled by a company that also has a financial interest

26

in a company employing a mold remediator may not …perform or offer to perform any mold remediation unless the remediator has documented training in water, mold, and respiratory protection under § 468.8414(2)." *Id.* § 468.8419(2)(a);

e) "A mold remediator, a company that employs a mold remediator, or a company that is controlled by a company that also has a financial interest in a company employing a mold remediator may not …perform or offer to perform any mold assessment to a structure on which the mold reme-diator or the mold remediator's company provided a mold remediation within the last 12 months." *Id.* § 468.8419(2)(d).

111. Plaintiffs are members of the class that each of the above statutes were designed to protect.

112. The statutes were intended to protect residents from the sorts of exposure-based injuries suffered by Plaintiffs and described in this Complaint.

113. Additionally, Florida Statutes § 386.03, § 386.051, and § 386.041 make it unlawful to maintain a sanitary nuisance as defined in Florida Statute § 386.01 and any other applicable statutes, codes, and regulations governing the habitability of res-idential housing and the health and safety of occupants.

114. The violations of these statutes constitute negligence per se and were the proximate cause of Plaintiffs' injuries.

27

### COUNT X: Medical Monitoring
### (against all Defendants)

115.   Plaintiffs incorporate the allegations set forth in paragraphs 1–47.

116.   Plaintiffs suffered physical injuries when they were exposed to hazardous mold, as described in this Complaint.

117.   As a result of their prolonged exposure to moisture-damaged indoor environments and associated microbial contamination at 8518 Levitow Street, the Gose family faces an increased and individualized risk of developing chronic and latent health conditions.

118.   SSgt Gose developed chronic sinus problems during the period of exposure and ultimately required sinus surgery; he requires ongoing otolaryngologic and respiratory evaluation and monitoring for the development or progression of chronic sinus and respiratory conditions.

119.   Both minor children developed allergy-type symptoms and breathing irritation during the occupancy; they require ongoing allergy and pulmonary evaluation and monitoring for the development of asthma, reactive airway disease, and chronic atopic disease.

120.   All minor Plaintiffs, whose immune and respiratory systems are still developing, face heightened long-term vulnerability from prolonged mold exposure, making early and ongoing monitoring critical.

121.   A licensed Moisture and Fungal Assessment documented suspected fungal growth within the HVAC closet, on the HVAC evaporator coils, on drywall

adjacent to the HVAC system, and on multiple HVAC supply vents throughout the residence, and independent testing in November 2025 confirmed significant toxic mold in the home. These findings corroborate the Gose family's exposures and inform the specific monitoring protocols reasonably necessary for each Plaintiff according to contemporary scientific principles.

122.   The monitoring protocols required will differ for each Plaintiff based on his or her individual presentations, but each member of the Gose family would benefit from regular evaluation.

123.   The monitoring procedure would be unnecessary in the absence of Plaintiffs' exposure.

124.   Given the exposure, monitoring regimes are reasonably necessary according to contemporary scientific principles.

125.   Plaintiffs are entitled to the cost of medical monitoring necessary to detect the onset or worsening of physical harm and/or, in the alternative, that the court use its equitable powers to create and supervise a medical monitoring fund.

### COUNT XI: Unjust Enrichment
### (against Defendant AMC)

126.   Plaintiffs incorporate the allegations set forth in paragraphs 1–47.

127.   Plaintiffs conferred a benefit on AMC in the form of the BAH rent that the military transferred on their behalf. These funds belonged to Plaintiffs and were paid to AMC in return for safe and habitable housing at MacDill Air Force Base.

128.   AMC failed to provide Plaintiffs with a safe and habitable home, and it

failed to timely and adequately remediate the recurring moisture, HVAC, and mold conditions that ultimately rendered the first home unfit for human occupancy and required the family's relocation to another residence in December 2025. It would be inequitable and unjust for AMC to retain the BAH funds provided by Plaintiffs.

129.    Plaintiffs are entitled to restitution of some or all of the BAH funds paid to AMC.

**COUNT XII: Violation of Florida Deceptive and Unfair Trade Practices Act (FDUTPA) (Unfair Conduct)**
**(against all Defendants)**

130.    Plaintiffs incorporate the allegations set forth in paragraphs 1–47.

131.    The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") renders unlawful unfair methods of competition, unconscionable acts or practices, and unfair acts or practices in the conduct of any trade or commerce. FLA. STAT. § 501.204.

132.    At all relevant times, Defendants solicited, advertised, offered, and/or provided goods, services, and/or property by leasing military housing at MacDill, and by providing property management services relating to such military housing. Defendants were thereby engaged in trade or commerce within the meaning of the FDUTPA. FLA. STAT. § 501.203.

133.    At all relevant times, Plaintiffs were consumers within the meaning of the FDUTPA. *Id.*

134.    Defendants' practices relating to Plaintiffs' housing at MacDill, as described in detail in this Complaint, constituted unfair and/or unconscionable acts or practices within the meaning of the FDUTPA and thus violated the FDUTPA.

135.   On information and belief, Defendants failed to follow their own policies and procedures relating to the treatment of harmful conditions, including policies and procedures for the treatment and remediation of mold.

136.   Defendants' acts and practices exposed Plaintiffs to unsafe and unhealthy conditions, including toxic mold, structural defects, water leaks, and HVAC issues. These abhorrent conditions were known to Defendants.

137.   Given those unconscionable conditions, Plaintiffs' interest in their Mac-Dill home was only worth a small fraction of the rental payments for that home.

138.   Defendants' acts and practices offended established public policy and were immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers. As such, those acts and practices were unfair and unconscionable within the meaning of the FDUTPA and thus violated the FDUTPA.

139.   As a result of Defendants' unfair and unconscionable acts or practices, Plaintiffs suffered losses and are entitled to recover actual damages, attorneys' fees, and court costs. FLA. STAT. § 501.211.

### COUNT XIII: Violation of Florida Deceptive and Unfair Trade Practices Act (FDUTPA) (Deceptive Conduct)
### (against all Defendants)

140.   Plaintiffs incorporate the allegations set forth in paragraphs 1–47.

141.   The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") renders unlawful deceptive acts or practices in the conduct of any trade or commerce. FLA. STAT. § 501.204.

142.   At all relevant times, Defendants solicited, advertised, offered, and/or

31

provided goods, services, and/or property by leasing military housing at MacDill, and by providing property management services relating to such military housing. Defendants were thereby engaged in trade or commerce within the meaning of the FDUTPA, see *id., e.g.*, § 501.203.

143.   At all relevant times, Plaintiffs were consumers within the meaning of the FDUTPA, *see id.*

144.   Defendants' practices relating to Plaintiffs' housing at MacDill, as described in detail in this Complaint, constituted false, misleading, and/or deceptive acts or practices within the meaning of the FDUTPA and thus violated the FDUTPA.

145.   On information and belief, AMC, as signatory to the lease, and all Defendants, through Harbor Bay's direct and ongoing communication with Plaintiffs, engaged in deceptive acts and practices, including the following:

 (a) Defendants concealed facts and made deceptive assurances that caused Plaintiffs to sign a lease that they never would have signed had they known the truth;

(b) Defendants made false, misleading, and/or deceptive representations that Plaintiffs' MacDill home was in habitable condition and thus far more valuable than it was in reality;

(c) on information and belief, in the lease between Defendants and Plaintiffs, Defendants falsely warranted that Plaintiffs' housing was safe, habitable, and free from defects;

(d) Defendants failed to disclose information that they knew about the

condition of Plaintiffs' housing with the intention of inducing Plaintiffs into leasing the home at a cost beyond what it was actually worth;

(e) once Plaintiffs discovered the unsafe and hazardous conditions in their home, Defendants falsely claimed that they would mitigate or fix those problems;

(f) Defendants made false, misleading, and/or deceptive representations that repairs and remediation efforts were performed completely and to the standard of care required of professional landlords; and

(g) Defendants failed to disclose the grossly inadequate nature of their repair and remediation efforts.

146.    As a few examples, Defendants (a) represented in the lease that the home was safe, clean, and habitable, when it was not; (b) dismissed visible pantry mold as "wood discoloration," through Mike Whitman, and performed no testing, while independent testing later confirmed toxic mold in the kitchen; (c) marked maintenance work orders "Complete" without performing any repairs; and (d) covered the damaged dining-room ceiling with plastic sheeting, exposing the family to mold for months rather than performing permanent repairs.

147.    Plaintiffs paid far more in rent than their home was actually worth.

148.    Due to their role in the leasing and/or management and maintenance of the Plaintiffs' home at MacDill, Defendants were uniquely aware of the condition of Plaintiffs' home, maintenance history, defects in design, the need for repairs, remodeling, and remediation, and the existence of mold and other hazardous conditions.

33

149.    As a result of Defendants' false, misleading, and deceptive acts or practices, Plaintiffs suffered losses and are entitled to recover actual damages, attorneys' fees, and court costs. FLA. STAT. § 501.211.

**COUNT XIV: Negligent Misrepresentation Concerning Condition of the Home**
**(against all Defendants)**

150.    Plaintiffs incorporate the allegations set forth in paragraphs 1–47.

151.    Plaintiffs' lease represented that, prior to moving in, their home was in safe, clean, and habitable condition. That representation was false, and Defendants failed to disclose the true condition of the home.

152.    Defendants either knew that Plaintiffs' home was unsafe and unfit for human habitation, made representations concerning the safety and habitability of the home without knowledge of their truth or falsity, or should have known that such representations were false.

153.    Defendants intended to convince Plaintiffs to sign a lease and move into their home based on these representations.

154.    Defendants knew or should have known that these statements would be material to the Plaintiffs' decisions to move into their home.

155.    Plaintiffs justifiably relied on Defendants' assurances that their home was safe, mold free, and fit for human habitation at the time that they moved in.

156.    As a direct and proximate result of Defendants' negligence, Plaintiffs suffered substantial damage to their personal property, physical injuries, financial injuries, and damages that will require medical testing/monitoring, as well as severe

mental and emotional distress related to those physical injuries.

### COUNT XV: Negligent Misrepresentation Concerning Repair and/or Remediation of Unsafe Conditions
### (against all Defendants)

157.   Plaintiffs incorporate the allegations set forth in paragraphs 1–47.

158.   Once Plaintiffs discovered the unsafe and hazardous conditions in their home, Defendants, including via Harbor Bay, downplayed the severity of those problems in order to convince Plaintiffs to remain in their home.

159.   Defendants falsely represented that hazardous and unsafe conditions, including mold and elevated indoor moisture, were innocuous or easily fixed conditions. Defendants knew or should have known that this was untrue.

160.   When Plaintiffs requested that Defendants repair unsafe and hazardous conditions in their home, Defendants falsely claimed that they would take appropriate steps to mitigate or fix those problems. Defendants either knew that they would never take those steps, made the representations without knowledge of their truth or falsity, or should have known the representations were false.

161.   On multiple occasions, Defendants claimed to have repaired an unsafe or hazardous condition, when they knew or should have known that they had not adequately done so.

162.   Defendants intended to convince Plaintiffs to remain in their home or agree to continue their occupancy based on these false representations.

163.   As a few examples, Defendants falsely (a) dismissed visible mold growth in the pantry as mere "wood discoloration"—through their then-Environmental

Supervisor, Mike Whitman, on or about May 3, 2025—and performed no testing or investigation, when independent testing in November 2025 confirmed significant toxic mold in the family's kitchen; (b) marked numerous maintenance work orders "Complete" when the reported moisture, HVAC, and mold conditions had not been permanently resolved; and (c) represented that the dining-room ceiling leak was being addressed while merely cutting a hole and placing a fan, and then covering the damaged ceiling with plastic sheeting in late July 2025 that remained until the family vacated approximately five months later, rather than repairing the roof or eliminating the source of the water intrusion. The names of the employees who made these representations, as well as the specific dates of when they were made are in the possession, custody, and control of the Defendants.

164.   Defendants knew or should have known that these statements would be material to the Plaintiffs' decisions whether to remain in their home.

165.   Plaintiffs justifiably relied on Defendants' assurances that they would take or had taken steps to make their home safe.

166.   As a direct and proximate result of Defendants' negligence, Plaintiffs suffered substantial damage to their personal property, physical injuries, financial damages, and damages that will require medical testing/monitoring, as well as mental and emotional distress related to those physical injuries.

**COUNT XVI: Fraudulent Inducement**
**(against all Defendants)**

167.   Plaintiffs incorporate the allegations set forth in paragraphs 1–47.

168. Defendants deliberately, willfully, and knowingly made false and material statements regarding the habitability and safety of Plaintiffs' housing as described in detail in this Complaint in order to induce Plaintiffs to sign a lease.

169. Plaintiffs' lease represented that, prior to moving in, their home was in safe, clean, and habitable condition. Defendants either knew or should have known that this was false at the time.

170. These representations were material to Plaintiffs' decisions to enter into their lease, causing Plaintiffs' BAH to be paid to Defendants.

171. At the time of leasing, Defendants were responsible for the condition, management, and maintenance of the home and were in a superior position to know of moisture, HVAC, and mold conditions affecting the residence.

172. Plaintiffs relied on Defendants' assurances that their home was safe and fit for human habitation at the time that they moved in.

173. Defendants knew or reasonably should have known that these statements, including the representations in the lease, were false. But for the Defendants' false statements, Plaintiffs would not have signed the lease for their MacDill home.

174. As a direct and proximate result of Defendants' fraudulent inducement, Plaintiffs suffered substantial damage to their personal property, physical injuries, financial injuries, and damages that will require ongoing medical testing/monitoring, as well as mental and emotional distress related to those physical injuries.

37

**COUNT XVII: Fraudulent Misrepresentation Concerning Repair
and/or Remediation of Unsafe Conditions
(against all Defendants)**

175.    Plaintiffs incorporate the allegations set forth in paragraphs 1–47.

176.    Defendants, including via Harbor Bay, deliberately and willfully made false and material statements regarding the habitability and safety of the Plaintiffs' housing, in order to cause Plaintiffs to remain in their home notwithstanding the unsanitary and dangerous conditions in it.

177.    Defendants made false statements to Plaintiffs that their home was suitable for habitation throughout the course of Plaintiffs' residence in the home.

178.    Once Plaintiffs discovered the unsafe and hazardous conditions in their home, Defendants consistently, deliberately, and falsely downplayed the severity of those problems. Defendants knew the true severity of those conditions, having themselves inspected and performed repair work at the home.

179.    When Plaintiffs persisted in demanding that Defendants repair unsafe and hazardous conditions in their home, Defendants falsely claimed that they would take steps to mitigate or fix those problems. Defendants knew that they would never do so, as demonstrated by their repeated pattern of performing only cosmetic or temporary repairs instead of addressing the underlying HVAC and moisture defects.

180.    On multiple occasions, Defendants claimed to have repaired an unsafe or hazardous condition, when Defendants knew, from their own technicians' prior visits to the home, that they had not adequately done so.

181.    As a few examples, Defendants falsely (a) dismissed visible mold growth

in the pantry as mere "wood discoloration"—through their then-Environmental Supervisor, Mike Whitman, on or about May 3, 2025—and performed no testing or investigation, when independent testing in November 2025 confirmed significant toxic mold in the family's kitchen; (b) marked numerous maintenance work orders "Complete" when the reported moisture, HVAC, and mold conditions had not been permanently resolved; and (c) represented that the dining-room ceiling leak was being addressed while merely cutting a hole and placing a fan, and then covering the damaged ceiling with plastic sheeting in late July 2025 that remained until the family vacated approximately five months later, rather than repairing the roof or eliminating the source of the water intrusion. The names of the employees who made these representations, as well as the specific dates of when they were made are in the possession, custody, and control of the Defendants.

182. Defendants knew that the statements concerning the condition and maintenance of the home and the promised remediation were false.

183. Plaintiffs justifiably relied on Defendants' assurances that they would take or had taken steps to make their home safe.

184. These representations were material to Plaintiffs' decisions to remain in their home.

185. But for Defendants' false statements, Plaintiffs would not have remained in their MacDill Air Force Base home.

186. As a direct and proximate result of Defendants' fraudulent misrepresentation, Plaintiffs suffered substantial damage to their personal property, physical

injuries, financial injuries, and damages that will require medical testing/monitoring, as well as mental and emotional distress related to those physical injuries.

### COUNT XVIII: Fraudulent Concealment of Condition of Housing
### (against all Defendants)

187.    Plaintiffs incorporate the allegations set forth in paragraphs 1–47.

188.    Defendants deliberately, willfully, and actively concealed material facts regarding the habitability and safety of the Plaintiffs' housing in order to cause Plaintiffs to sign a lease for their MacDill home.

189.    Plaintiffs' lease represented that, prior to moving in, their home was in safe, clean, and habitable condition. Defendants either knew or should have known that this would conceal the true conditions at the home.

190.    Defendants failed to disclose known or knowable moisture, HVAC, and mold conditions affecting the home, while representing the home to be safe, clean, and habitable.

191.    Defendants, as lessors and landlords and/or as the agents of the lessors and landlords, owed Plaintiffs a duty to disclose their knowledge of hazardous and unsafe conditions in their home.

192.    Additionally, Defendants had knowledge of the defects in the home or were better positioned to discover such defects and therefore had a duty to disclose those material facts to Plaintiffs and failed to do so.

193.    Defendants knew or reasonably should have known that the concealed or omitted facts were material to Plaintiffs' decisions to sign a lease and move into

their home and should have been disclosed.

194.   Defendants knew that their concealments would induce Plaintiffs to act.

195.   Plaintiffs relied on Defendants' concealments and omissions.

196.   But for the Defendants' fraudulent concealments and material omissions, Plaintiffs would not have signed the lease for their MacDill Air Force Base home.

197.   As a direct and proximate result of Defendants' fraudulent concealment, Plaintiffs suffered substantial damage to their personal property, physical injuries, financial injuries, and damages that will require medical testing/monitoring, as well as mental and emotional distress related to those physical injuries.

### COUNT XIX: Fraudulent Concealment Concerning Repair and/or Remediation of Unsafe Conditions (against all Defendants)

198.   Plaintiffs incorporate the allegations set forth in paragraphs 1–47.

199.   Defendants, including through Harbor Bay, deliberately, willfully, and actively concealed material facts regarding the habitability and safety of Plaintiffs' housing in order to cause Plaintiffs to remain in their MacDill Air Force Base home.

200.   Defendants, as lessors and landlords and/or as the agents of the lessors and landlords, owed Plaintiffs a duty to disclose their knowledge of continuing hazardous and unsafe conditions in their home.

201.   Additionally, Defendants had knowledge of the defects in the home or were better positioned to discover such defects and therefore had a duty to disclose those material facts to Plaintiffs and failed to do so.

202.   As a few examples, Defendants falsely (a) dismissed visible mold growth

41

in the pantry as mere "wood discoloration"—through their then-Environmental Supervisor, Mike Whitman, on or about May 3, 2025—and performed no testing or investigation, when independent testing in November 2025 confirmed significant toxic mold in the family's kitchen; (b) marked numerous maintenance work orders "Complete" when the reported moisture, HVAC, and mold conditions had not been permanently resolved; and (c) represented that the dining-room ceiling leak was being addressed while merely cutting a hole and placing a fan, and then covering the damaged ceiling with plastic sheeting in late July 2025 that remained until the family vacated approximately five months later, rather than repairing the roof or eliminating the source of the water intrusion. The names of the employees who made these representations, as well as the specific dates of when they were made are in the possession, custody, and control of the Defendants.

203.    Defendants fraudulently concealed ongoing dangers in the home by engaging in cosmetic repairs that disguised the continuing hazardous and unsafe conditions while telling Plaintiffs that repairs had been successfully completed.

204.    Defendants knew or reasonably should have known that the concealed or omitted facts were material to Plaintiffs' decisions to remain in their home and should have been disclosed.

205.    Defendants knew that their concealment or omission would induce the Plaintiffs to act or refrain from acting.

206.    Plaintiffs relied on Defendants' concealments and omissions.

207.    But for the Defendants' fraudulent concealments and material omissions,

Plaintiffs would not have remained in their MacDill Air Force Base home.

208.   As a direct and proximate result of Defendants' fraudulent concealment, the Plaintiffs suffered substantial damage to their personal property, physical injuries, financial injuries, and damages that will require medical testing/monitoring, as well as mental and emotional distress related to those physical injuries.

## DAMAGES

As a result of the Defendants' breaches, negligence, gross negligence, fraud, and other acts and omissions described in this Complaint, Plaintiffs have sustained damages and injuries and are entitled to recover damages related to the following, including but not limited to:

a. Past and future physical pain and suffering;

b. Past and future mental anguish and emotional distress;

c. Past and future medical, healthcare, and attendant care expenses;

d. Past and future lost income and earning capacity;

e. Past and future physical impairment;

f. Past and future loss of enjoyment and quality of life;

g. Past and future loss of enjoyment of property;

h. Increased risk of future harm and medical monitoring for life;

i. Loss of life expectancy;

j. Nuisance damages, including inconvenience, illness, and fear;

k. Out of pocket expenses;

l. Loss of and/or damage to personal property;

m. Costs, expenses, and fees, including attorneys' fees; and

n.  Punitive damages.

## PRAYER FOR RELIEF

Plaintiffs pray that this Court:

A. Award the Plaintiffs compensatory damages, in an amount to be determined at trial;

B. Award punitive damages as appropriate, including for counts III, V, VI, VII, IX, XIV, XV, XVI, XVII, XVIII, XIX, in an amount to be determined at trial;

C. Award the Plaintiffs pre-judgment and post-judgment interest and any other costs, expenses, or fees, including attorneys' fees, to which they may be entitled by law, and;

D. Grant the Plaintiffs such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury for all issues so triable.

DATED: August 10, 2026.                    Respectfully submitted,

                                           /s/ Robert J. McKee
                                           Robert J. McKee
                                           Florida Bar No.: 972614
                                           THE MCKEE LAW GROUP, LLC
                                           2800 South Flamingo Road
                                           Davie, Florida 33330
                                           Tel: (954) 888-9877
                                           Fax: (954) 217-0150
                                           Email: rmckee@themckeelawgroup.com
                                           Lead Counsel

                                           Vincent J. Colatriano*
                                           Michael Weitzner*
                                           COOPER & KIRK, PLLC
                                           1523 New Hampshire Ave. NW
                                           Washington, D.C. 20036
                                           Tel: 202-220-9600
                                           Fax: 202-220-9601
                                           Email: vcolatriano@cooperkirk.com
                                           Email: mweitzner@cooperkirk.com

                                           Kristina Baehr*
                                           Christopher LaCour*
                                           JUST WELL LAW, PLLC
                                           1809 Pearl Street
                                           Austin, Texas 78701
                                           Tel: (512) 693-8029
                                           Email: Kristina@well.law
                                           Email: Chris@well.law
                                           Email: Militaryhousing-
                                           lit_PLslistserv@well.law

                                               *Pro Hac Vice forthcoming
                                           Attorneys for Plaintiffs